IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT CHRISTOPHER JIMENEZ,

    Plaintiff,                    No. 2:10-cv-2943 KJM KJN P

    vs.

J. WHITFIELD,

    Defendant.                 FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is a state prisoner proceeding without counsel. In the March 22, 2010 amended complaint, filed pursuant to 42 U.S.C. § 1983, plaintiff alleges that he was re-validated as a member of the Northern Structure prison gang while housed at California State Prison, Solano, and placed in the security housing unit ("SHU"), in violation of plaintiff's constitutional rights. The sole remaining claim in this case is whether defendant Whitfield violated plaintiff's due process rights on October 17, 2006, by failing to give plaintiff an opportunity to air his views concerning his gang validation.[1] On June 11, 2012, defendant Whitfield filed a motion for summary judgment alleging that he went to plaintiff's cell in Administrative Segregation at noon

---

[1] On March 20, 2012, defendants' motion for judgment on the pleadings was granted as to all claims and all defendants, with the exception of this remaining claim. (Dkt. No. 51.)

1

on October 17, 2006, to hear plaintiff's views on his gang validation, but plaintiff refused to leave his cell to speak with defendant Whitfield. Plaintiff filed an opposition on September 5, 2012, and defendant filed a reply on September 13, 2012. For the reasons set forth below, the court recommends that defendant's motion be granted.

II. Background

On June 7, 2007,[2] plaintiff was validated as a Northern Structure gang member by the Law Enforcement and Investigative Unit ("LEIU"). (Dkt. No. 11 at 25.)[3] The LEIU received a gang validation packet from Institution Gang Investigator R.L. Bond on November 21, 2006, consisting of five items:

    1. CDC 128B dated September 23, 2006 (Staff Information)
    2. Confidential Memorandum dated September 5, 2006 (Informants)
    3. CDC 128B dated July 27, 2006 (Communications-direct link)
    4. Confidential Memorandum dated January 11, 2005 (Written Material)
    5. CDC 128B dated September 9, 2006 (Tattoos)

(Id.) However, the committee determined that item 5 (tattoos) did not meet the validation requirements and was not used to validate plaintiff as a gang member. (Id.) Lt. Bond provided a report describing the source items and recommending that plaintiff be validated. (Dkt. No. 48 at 7.)[4]

Plaintiff challenged this gang validation on multiple grounds. (Dkt. No. 9.) However, with regard to plaintiff's due process claims, on March 20, 2012, the undersigned found that in connection with the gang validation hearing, plaintiff received adequate notice prior

---

[2] In the amended complaint, plaintiff states he was re-validated as a gang member on July 20, 2007. (Dkt. No. 9 at 1.)

[3] On February 11, 2010, plaintiff's motion to present evidence (documents) was granted. (Dkt. No. 7, admitting Dkt. No. 6.) On November 9, 2010, plaintiff's motion to enter certain documents as exhibits was granted. (Dkt. No. 15, admitting Dkt. No. 11.)

[4] On November 8, 2011, the court noted plaintiff's amended complaint referred to various exhibits not appended, and that the separate exhibits provided (dkt. nos. 6 & 11) were not marked with exhibit numbers coinciding with the amended complaint. (Dkt. No. 47.) Per court order, on December 5, 2011, plaintiff filed the duly-marked exhibits. (Dkt. No. 48.)

to the hearing, and that the gang validation decision was supported by some evidence that was sufficiently reliable to satisfy due process standards. (Dkt. No. 49 at 12; 14-17.) However, the court found that the record was insufficiently developed to allow the court to determine the length of the disciplinary hearing, and whether plaintiff could have returned to his cell by "approximately 1200 hours" on October 17, 2006, such that plaintiff was deprived of an opportunity to air his views on the gang validation packet, particularly in light of plaintiff's contention that he was not in his cell at noon on that date. (Dkt. No. 49 at 13.)

III. Standards for a Motion for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56(c) is met. "The judgment sought should be rendered if . . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id., citing Fed. R. Civ. P. 56(c). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should be granted, "so long

////

1 as whatever is before the district court demonstrates that the standard for entry of summary
2 judgment, as set forth in Rule 56(c), is satisfied." Id.

3   If the moving party meets its initial responsibility, the burden then shifts to the
4 opposing party to establish that a genuine issue as to any material fact actually exists. See
5 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to
6 establish the existence of such a factual dispute, the opposing party may not rely upon the
7 allegations or denials of its pleadings, but is required to tender evidence of specific facts in the
8 form of affidavits, and/or admissible discovery material in support of its contention that the
9 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party
10 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
11 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
12 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
13 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
14 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,
15 1436 (9th Cir. 1987).

16   In the endeavor to establish the existence of a factual dispute, the opposing party
17 need not establish a material issue of fact conclusively in its favor. It is sufficient that "the
18 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
19 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary
20 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
21 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
22 committee's note on 1963 amendments).

23   In resolving a summary judgment motion, the court examines the pleadings,
24 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
25 any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,
26 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

1  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.
2  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
3  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen
4  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
5  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
6  show that there is some metaphysical doubt as to the material facts . . .  Where the record taken
7  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
8  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By orders filed January 12, 2011, and July 24, 2012, the court advised plaintiff of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

IV.  Fourteenth Amendment - Due Process Standards

The Due Process Clause protects plaintiff against the deprivation of liberty without the procedural protections to which he is entitled under the law.  Wilkinson v. Austin, 545 U.S. 209, 221 (2005).  Protected liberty interests arise from the Fourteenth Amendment's Due Process Clause itself, or from state laws or regulations deemed to have created a liberty interest cognizable as a civil right.  Meachum v. Fano, 427 U.S. 215, 224-27 (1976).

The Due Process Clause itself does not confer on inmates a liberty interest in avoiding more adverse conditions of confinement, id. at 221-22 (citations and quotation marks omitted), and under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the condition of confinement at issue, id. at 222-23 (citing Sandin v. Conner, 515 U.S. 472, 481-84 (1995), quotations omitted.)  Liberty interests created by prison regulations are generally limited to freedom from restraint which imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

////

1  Wilkinson, 545 U.S. at 221 (citing Sandin, 515 U.S. at 484) (quotation marks omitted); Myron v.
2  Terhune, 476 F.3d 716, 718 (9th Cir. 2007).

3          The assignment of validated gang members and associates to the SHU is an
4  administrative measure rather than a disciplinary measure and is "essentially a matter of
5  administrative discretion."  Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003) (quoting Munoz
6  v. Rowland, 104 F.3d 1096, 1098 (9th Cir. 1997)).[5]  As a result, prisoners are entitled to the
7  minimal procedural protections of adequate notice, an opportunity to be heard, and periodic
8  review.  Bruce, 351 F.3d at 1287 (citing Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th
9  Cir. 1986), abrogated in part on other grounds by Sandin, 515 U.S. at 472)).  In addition to these
10 minimal protections, there must be "some evidence" supporting the decision.  Id. (citing
11 Superintendent v. Hill, 472 U.S. 445, 454 (1985)).

12 V.  Undisputed Facts

13         For purposes of summary judgment, the court finds that the following facts are
14 either not disputed, or, following the court's review of the evidence submitted, are deemed
15 undisputed, unless otherwise indicated:

16         1.  At the times relevant to this action, plaintiff Robert Jimenez was a prisoner in
17 the custody of the California Department of Corrections and Rehabilitation ("CDCR") at
18 California State Prison-Solano ("CSP-Solano").  (Whitfield Decl. ¶ 15.)

19         2.  On September 9, 2006, Correctional Officer R. Jones issued a Rules Violation
20 Report to plaintiff, charging him with participating in a riot.  (Brown Decl. ¶ 9, Ex. 1.)

21 ////
22 ////

---

[5] Thus, Wolff v. McDonnell, 418 U.S. 539 (1974), which requires more stringent procedural protections is not applicable because the placement in the SHU for gang affiliation is administrative, rather than disciplinary, segregation.  See Munoz, 104 F.3d at 1098 (suspected gang members are placed in SHU "to preserve order in the prison and protect the safety of all inmates.")

6

3. Lt. S.W. Brown is a Correctional Lieutenant with the CDCR at CSP-Solano, whose duties include presiding at disciplinary hearings for inmates charged with rule violations. (Brown Decl. ¶¶ 1-2.)

4. In the past seven years, Lt. Brown has presided at more than 500 disciplinary hearings. (Brown Decl. ¶ 3.)

5. In Lt. Brown's experience, the shortest disciplinary hearings lasted twenty to thirty minutes, and the longest lasted hours; sometimes he had to continue a hearing to another day. (Brown Decl. ¶ 4.)

6. A disciplinary hearing tends to be short when: the charge is simple; the charged inmate elects to make no statement and elects to have few or no witnesses appear at the hearing; few or no staff witnesses are called to make statements against the charged inmate; little or no documentary evidence is presented by the charged inmate; and little or no conflicting evidence creates difficulty in reaching a decision concerning the charge. (Brown Decl. ¶ 5.)

7. None of Lt. Brown's disciplinary hearings took less than twenty minutes because that is the minimum time he needs to assure due-process requirements are satisfied, such as: confirming with the charged inmate that he timely received a copy of the initial Rules Violation Report, and that the hearing was convened within thirty days after his receipt; confirming that the charged inmate was not mentally ill at the time of the charge or at the hearing; confirming that the charged inmate understands that he has a right to make a statement, question witnesses, and present evidence; and informing the charged inmate of his right to appeal the decision and apply for restoration of any lost credits. (Brown Decl. ¶ 6.)

8. A disciplinary hearing tends to be long when: the charge concerns a complicated set of facts; the charged inmate makes a long statement and calls many witnesses; many staff witnesses make statements against the charged inmate; much documentary evidence is presented by one or both sides; and the evidence is in conflict, thus requiring much deliberation to resolve. (Brown Decl. ¶ 7.)

1         9. On October 17, 2006, Lt. Brown served as the hearing officer for plaintiff at

2 his disciplinary hearing on Rules Violation Report S1-06-09-0483, charging plaintiff with

3 participating in a riot. (Brown Decl. ¶¶ 8-9; Ex. 1; Dkt. No. 48 at 5.)

4         10. When Lt. Brown presided at plaintiff's October 17 disciplinary hearing, his

5 custom and practice was to begin the hearing by introducing himself and then going over

6 preliminary matters: obtain inmate's confirmation that the had received the copy of the initial

7 Rules Violation Report within fifteen days of the charged misconduct, and that the hearing was

8 within thirty days of his receipt of the initial Rules Violation Report; state assessment of inmate's

9 mental health at the time of charged misconduct, and that the inmate's mental health was

10 satisfactory for the hearing; confirm whether an investigative employee or staff assistant had

11 been assigned. (Brown Decl. ¶ 10.)

12         11. The preliminary matters that Lt. Brown customarily reviewed with the inmate

13 took between ten and fifteen minutes. (Brown Decl. ¶ 11.)

14         12. After the preliminary matters, Lt. Brown customarily read the charge to the

15 inmate, and asked for his plea and whether he wished to make a statement. (Brown Decl. ¶ 12.)

16         13. At plaintiff's October 17 hearing, plaintiff pled not guilty to the charge and

17 declined to make a statement, which took no more than a minute. (Brown Decl. ¶ 13.)

18         14. After plaintiff's plea, Lt. Brown identified the evidence that had been

19 presented, including: the Rules Violation Report, the Crime/Incident Report, and the Medical

20 Incident Report, all dated September 9, 2006, the date of the riot that plaintiff was charged with

21 participating in. (Brown Decl. ¶ 14.)

22         15. Identifying the evidence took less than a minute. (Brown Decl. ¶ 15.)

23         16. Plaintiff chose to have no witnesses present at the hearing, and no witnesses

24 appeared at the hearing. (Brown Decl. ¶ 16.)

25 ////

26 ////

17. Lt. Brown asked plaintiff only five questions, to each of which he answered with a single short sentence, requiring only one to two minutes for all of the questions and answers. (Brown Decl. ¶ 17.)

18. Based on the statement of Correctional Officer R. Jones, who issued the Rules Violation Report, the medical report of plaintiff's injuries on the date of the riot, and the CDCR Crime/Incident Report, Lt. Brown found plaintiff guilty as charged. (Brown Decl. ¶ 18.)

19. Lt. Brown required between three and five minutes to consider the evidence, tell plaintiff of his finding of guilt, explain to him the reasons for that finding, and specify the punishment that would be imposed -- ninety days loss of work time credits. (Brown Decl. ¶ 19.)

20. Lt. Brown spent another two to three minutes informing plaintiff of his right to an appeal within fifteen days, and that he could apply for restoration of credits. (Brown Decl. ¶ 20.)

21. Customarily, if any issue or circumstance arose in the course of a disciplinary hearing, Lt. Brown would note that event in the Rules Violation Report. (Brown Decl. ¶ 21.)

22. The absence of any note indicating any issue or circumstance arose in plaintiff's October 17 hearing indicates that no such issue or circumstance arose at that hearing. (Brown Decl. ¶ 22.)

23. Plaintiff's October 17 hearing began at 10:33 a.m. and, given plaintiff's refusal to make a statement, his election not to call any witnesses, and the absence of any other complicating circumstances, would have lasted no more than thirty minutes. (Brown Decl. ¶ 23.)

24. After a disciplinary hearing, inmates are customarily returned directly to their cells. (Brown Decl. ¶ 24.)

25. Lt. Brown conducted plaintiff's hearing in Administrative Segregation. (Brown Decl. ¶ 25.)

26. All disciplinary hearings conducted in Administrative Segregation are for only inmates who are housed in Administrative Segregation. (Brown Decl. ¶ 26.)

27. Returning plaintiff to his cell after the hearing would have taken no more than a minute or two because the hearing was in Administrative Segregation, where plaintiff was celled at the time. (Brown Decl. ¶ 27.)

28. Defendant Jonathan Whitfield worked for CDCR in the Investigative Services Unit ("ISU") at CSP-Solano.

29. Among Defendant's duties in ISU, he investigated suspected prison gang activity, obtained evidence showing that an inmate was a member or associate of a prison gang, and assisted in the gang-validation process. (Whitfield Decl. ¶ 3.)

30. Gang validation was a process by which inmates who were affiliated with a prison gang were identified and, once validated as gang affiliates, were subject to placement in a Security Housing Unit in isolation from the general population. (Whitfield Decl. ¶ 4.)

31. The gang validation process began with one or more gang investigators collecting evidence showing that a given inmate is a prison-gang affiliate. (Whitfield Decl. ¶ 5.)

32. The investigators compiled and documented the evidence in a "gang validation packet." (Whitfield Decl. ¶ 6.)

33. Before sending the gang validation packet to LEIU, the investigator delivered to the subject inmate: (a) a copy of the gang-validation documents (excepting confidential documents that revealed the identity of confidential informants); (b) at least twenty-four hours to review the documents; and (c) the opportunity after reviewing the documents to air his views to the Institution Gang Investigator ("IGI"). (Whitfield Decl. ¶ 7.)

34. Instead of providing copies of confidential documents, the inmate was given a CDC 1030 confidential information disclosure form, indicating that confidential information was being considered, the reason that the confidential information was considered reliable, the nature of the confidential information, and the type and current location of the confidential document. (Whitfield Decl. ¶ 8.)

////

35. After the inmate was given the opportunity to air his views, the ISU Lieutenant sent the packet to the LEIU in Sacramento for consideration. (Whitfield Decl. ¶ 9.)

36. The LEIU determined whether each piece of evidence supporting the gang-validation met the standards of reliability that are set forth in prison regulations. (Whitfield Decl. ¶ 10.)

37. If LEIU determined that the evidence meets the standards of reliability, the LEIU officer would validate the inmate as a prison gang member or associate by signing the cover page of the gang-validation packet and returning it to the prison where the inmate was housed. (Whitfield Decl. ¶ 11.)

38. Once the LEIU gang-validated the inmate and returned the packet to the prison where the inmate was housed, a hearing was convened before a gang-validation committee, which decided whether to recommend the inmate to SHU. (Whitfield Decl. ¶ 12.)

39. During 2006, defendant documented four of five items showing that plaintiff was a member in the Northern Structure prison gang; Lieutenant R. Bond, who was then in charge of ISU, prepared documentation for the remaining item. (Whitfield Decl. ¶ 13.)

40. On October 16, 2006, at around noon, defendant delivered copies of documents pertaining to the five items to plaintiff in the Administrative Segregation, Housing Unit 9, cell 116, where plaintiff was housed at the time. (Whitfield Decl. ¶ 14.)

41. The documents defendant delivered to plaintiff included: a CDC 128B dated September 9, 2006; a CDC 128B dated September 23, 2006; and three CDCR 1030 confidential information disclosure forms concerning a confidential memorandum dated January 11, 2005, a confidential CDC 128B dated July 27, 2006, and a confidential memorandum dated September 5, 2006. (Whitfield Decl. ¶ 15.)

42. In addition to delivering these documents to plaintiff, defendant informed plaintiff that he was being given twenty-four hours to review the documents, and that defendant would return after that time to hear his views about the documents. (Whitfield Decl. ¶ 16.)

43. The next day, October 17, 2006, at around noon, defendant went to plaintiff's cell to hear plaintiff's views on the documents defendant had delivered to him on October 16. (Whitfield Decl. ¶ 17.)

44. In accordance with defendant's training and practice, defendant instructed plaintiff to exit his cell before speaking with him about the gang validation. (Whitfield Decl. ¶18.)

45. In response to defendant's instruction, plaintiff refused to exit his cell. (Whitfield Decl. ¶ 19; Barnts Decl. ¶¶ 3-6; Ex. 3.)

46. Defendant repeated his instruction for plaintiff to exit his cell, and again plaintiff refused.  (Whitfield Decl. ¶ 20; Barnts Decl. ¶¶ 3-6; Ex. 3.)

47. As a result of plaintiff's repeated refusals to exit his cell, defendant received no comments from him about his gang validation packet.  (Whitfield Decl. ¶ 21.)

48. Defendant documented his delivery of the gang validation packet to plaintiff on October 16, 2006, and his unsuccessful attempt to discuss the gang validation documents with him on October 17, 2006, on a CDC 128B.  (Whitfield Decl. ¶ 22; Ex. 2.)

49. Defendant submitted the CDC 128B concerning his encounters with plaintiff on October 16 and 17 with the other documents in his gang validation packet to the LEIU. (Whitfield Decl. ¶ 23.)

50. As a general rule, a prisoner housed in Administrative Segregation is subject to greater limitations than prisoners in the general population; for example, prisoners housed in Administrative Segregation typically have their meals in their cells, they must be escorted to and from their showers, and their yard time is more strictly controlled.  (Barnts Decl. ¶¶ 7-8.)

51. In addition, a prisoner housed in Administrative Segregation may not leave his cell for a medical or dental appointment, or travel for a court appearance, medical treatment, or any other purpose, without written authorization.  (Barnts Decl. ¶ 9.)

////

52. Documents authorizing an inmate to leave his cell in Administrative Segregation are maintained in either the inmate's central file or medical file, or both. (Barnts Decl. ¶ 10.)

53. Plaintiff's central and medical files contain no documents authorizing him to leave his cell on October 17, 2006, except for a Rules Violation Report, Log No. S1-06-09-0483, indicating that he attended a disciplinary hearing in the Administrative Segregation unit that day at 10:33 a.m. (Barnts Decl. ¶¶ 11-12.)

VI. Analysis

As set forth above, the sole issue here is whether defendant gave plaintiff an opportunity to air his views on October 17, 2012, in Administrative Segregation.[6] In his verified amended complaint, plaintiff states that he was not in his cell on October 17, 2006, because he was at a hearing that morning at 10:33 a.m. "or so." (Dkt. No. 9 at 2.) In his verified opposition to defendants' motion for judgment on the pleadings, plaintiff stated that at 12:00 p.m. on October 17, 2006, plaintiff was at a "115" hearing. (Dkt. No. 42 at 6.)

In support of the motion, defendant provided his declaration stating that on October 17, 2006, at around noon, he went to plaintiff's cell to hear his view on the gang validation documents delivered on October 16. However, plaintiff refused to exit his cell. (Dkt. No. 60-4 at 3.) Defendant again instructed plaintiff to exit his cell, but plaintiff again refused. (Id.) Thus, defendant received no comments from plaintiff about the gang validation packet. (Id.)

Plaintiff's Inmate Segregation Record, CDC 114-A, Record of Daily Activity, also reflects that defendant visited plaintiff's cell on October 17, 2006, to discuss his validation

////

---

[6] In his opposition, plaintiff reiterates his view that defendants were required to provide him with written notice twenty-four hours prior to the interview; however, the court previously found that plaintiff was provided adequate notice. (Dkt. No. 49 at 12.)

13

1  packet, but plaintiff "refused to come out." (Dkt. No. 60-5 at 4.)[7] The September 23, 2006 128B

2  form completed and signed by defendant, and used to re-validate plaintiff as a gang member, also

3  stated that plaintiff refused to come out to talk to defendant. (Dkt. No. 60-4 at 6.)

4  In addition, defendant provided the declaration of Lt. Brown, who presided over

5  plaintiff's disciplinary hearing on October 17, 2006. (Dkt. No. 60-3.) Lt. Brown declared that

6  plaintiff's

> October 17 hearing began at 10:30 a.m. and, given [plaintiff's]
> refusal to make a statement, his election not to call any witnesses,
> and the absence of any other complicating circumstances, would
> have lasted no more than thirty minutes.

10  (Dkt. No. 60-3 at 4.) Lt. Brown declared that returning plaintiff to his cell after the hearing

11  would have taken no more than a minute or two because plaintiff was housed in Administrative

12  Segregation at that time. (Id.)

13  Defendant also provided the declaration of Litigation Coordinator Barnts, who

14  declared that an inmate housed in Administrative Segregation may not leave his cell without

15  written authorization, copies of which are retained in the inmates' medical or central files. (Dkt.

16  No. 60-5 at 2.) Barnts reviewed plaintiff's medical and central files, and found no documents

17  authorizing him to leave his cell during the morning of October 17, 2006, except for the

18  disciplinary hearing held that morning at 10:33 a.m. (Dkt. No. 60-5 at 2.)

19  As argued by defendant, plaintiff failed to rebut defendant's evidence. The

20  documentary evidence demonstrates that plaintiff was in a rules violation hearing at 10:33 a.m.

21  (Dkt. No. 48 at 5.) Although the RVR does not reflect the time the hearing was adjourned,

22  defendant's evidence reflects that plaintiff was returned to his cell well before noon on October

---

[7] In his opposition, plaintiff reiterates his claim that defendant did not deliver plaintiff a document, paper, notice in writing of any kind. (Dkt. No. 73 at 4.) As noted in the prior footnote, the court previously found plaintiff was provided adequate notice. (Dkt. No. 49 at 12.) Moreover, the Record of Daily Activity log reflects that defendant "dropped off 1030's 128-B" on October 16, 2006. (Dkt. No. 60-5 at 4.)

14

17, 2006. Plaintiff provides no evidence to rebut this timing, other than to simply declare he was at the disciplinary hearing, and was not in his cell at noon. Plaintiff did not rebut the Inmate Segregation Record, which independently corroborates defendant's declaration that he visited plaintiff's cell, and plaintiff "refused to come out."

Plaintiff argues that defendant has not demonstrated the "exact time" the disciplinary hearing was completed, or that plaintiff was returned to his cell, and claims that defendant did not even know the "exact time" that he presented at plaintiff's cell on October 17, 2006. (Dkt. No. 73 at 3.) However, defendant presented evidence that plaintiff was returned to his cell well before noon, and that defendant went to plaintiff's cell on October 17, 2006, at around noon. Plaintiff did not rebut that evidence. Plaintiff failed to show that there were extraordinary circumstances, not recorded in Lt. Brown's rules violation report, that would have required a longer hearing. Moreover, the record reflects that the disciplinary hearing was fairly routine – plaintiff made no statement, no witnesses were called, and few questions were asked and short answers were given. (Dkt. No. 60-3 at 8-9.) Plaintiff provided no competent evidence demonstrating that he was somewhere else that morning, or that plaintiff was somehow delayed between the adjournment of the hearing and his return to his cell. Plaintiff previously argued that he was double-celled, suggesting defendant might have talked to plaintiff's cellmate. (Dkt. No. 9 at 2.) However, plaintiff did not provide a declaration from his cellmate confirming that defendant actually spoke with the cellmate rather than plaintiff on October 17, 2006.

In his verified opposition, plaintiff failed to address defendant's evidence, but primarily argued issues previously resolved in the motion for judgment on the pleadings. Plaintiff vaguely argued that the testimony of Lt. Brown and Litigation Coordinator Barnts was fabricated, unreliable or not credible (dkt. no. 73 at 3), but provided no explanation or basis for these assertions, and cited no evidence in support of such a position.

////

////

At bottom, defendant presented the following evidence:

    1. The disciplinary hearing, held in Administrative Segregation, began at 10:33 a.m. on October 17, 2006, would not have taken over thirty minutes, and plaintiff would have been returned to his cell in Administrative Segregation a few minutes later. (Dkt. No. 60-3 at 4.)

    2. The Inmate Segregation Record reflects defendant came to plaintiff's cell on October 17, 2006, and plaintiff refused to come out. (Dkt. No. 60-5 at 4.)

    3. Litigation Coordinator Barnts declared that there was no document in plaintiff's medical or central files demonstrating plaintiff was out of his cell on October 17, 2006, except for the disciplinary hearing at 10:33 that morning. (Dkt. No. 60-5 at 2.)

The burden then shifted to plaintiff to establish that a genuine issue as to any material fact actually exists. However, despite being provided with specific guidance as to what was required to oppose the motion (dkt. no. 70), plaintiff failed to demonstrate that there is a material dispute of fact as to whether plaintiff was afforded the opportunity to present his views. Rather, the undisputed evidence reflects that plaintiff was afforded the opportunity, but plaintiff refused to be interviewed or discuss the gang validation packet with defendant. Due process in this context requires only an informal, nonadversary proceeding where the inmate receives notice of the charges and an opportunity to present his views to the prison officials making the decision. See Toussaint, 801 F.2d at 1100. Thus, plaintiff's due process rights were not violated.

VII. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that defendant's June 11, 2012 motion for summary judgment (dkt. no. 60) be granted, and this action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

1  objections shall be filed and served within fourteen days after service of the objections.  The
2  parties are advised that failure to file objections within the specified time may waive the right to
3  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
4  DATED:  November 26, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

jime2943.msj